UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

DERRICK TAYLOR,                  :
                                 :
     Plaintiff,                  :
                                 :
v.                               :     CASE NO. 3:10-cv-245 (HBF)
                                 :
BRIAN K. MURPHY, et al.,         :
                                 :
     Defendants.                 :


BENCH RULING

Plaintiff Derrick Taylor ("Taylor") brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by denying him a meaningful opportunity for recreation. Plaintiff's constitutional claim arises out of a Department of Corrections policy change in September 2009 that required inmates in Phase I of the Security Risk Group Safety Threat Member ("SRGSTM") program at Northern Correctional Institute ("Northern"), to wear handcuffs during their recreation period.  During the time period giving rise to plaintiff's allegations, defendant Angel Quiros was the Warden at Northern, Michael LaJoie was the Department of Corrections District Administrator, and Brian Murphy was the interim Acting Commissioner for the Department of Corrections.

1

Plaintiff seeks injunctive and declaratory relief in addition to an award of nominal and punitive damages. A court trial was held March 13, 14, 15, 16 and 19, 2012.[1] At trial, plaintiff testified on his own behalf and also presented the testimony of inmate Chauncey Sturdivent; inmate Rayquan Stokely; Michael LaJoie, District Administrator; Captain Gerald Hines; Andrew Cameron, correctional recreational supervisor at Northern; Angel Quiros[2], District Administrator; Dr. Suzanne Ducate; and the expert testimony of Douglas Baumgarten, an expert in exercise science. [doc. #92, Pl.'s Witness List]. Defendants offered the testimony of Brian Murphy, retired Acting Commissioner of the Department of Corrections; John Aldi, Counselor Supervisor and Security Risk Group coordinator; Captain Butkiewiez, SRGSTM Phase I unit manager; and the expert testimony of Dr. Suzanne Ducate, director of psych services and principal psychiatrist for the Department of Corrections, and an expert in correctional medicine. The testimony and evidence adduced at the trial are summarized below as necessary to explain the Court's findings and conclusions. For the reasons that follow, the Court enters judgment in favor of the defendants.

---

[1]  Given the similarity in claims, this case was tried in conjunction with the case, Lamont v. Murphy, 10cv1364 (HBF). Plaintiffs Taylor and Lamont were both ably represented by pro bono counsel, Attorney Robert Mitchell. Defendants in both cases were represented by Assistant Attorneys General Ann Lynch and Steven Strom.  Following the presentation of evidence in the Taylor case, the Court granted the parties' motion to incorporate all exhibits and testimony from the Taylor case into the Lamont case.

[2]  Mr. Quiros testified by deposition. [Pl.'s Ex. 7].

I.  <u>FINDINGS OF FACT</u>

   *A. THE SECURITY RISK GROUP SAFETY THREAT MEMBER PROGRAM*

1.   Northern is a level 5 maximum level security institution, housing  inmates on death row, gang threat program inmates, inmates with chronic discipline, and inmates who have demonstrated a serious inability to adjust to confinement, posing a threat to the safety and security of the community, staff and other inmates.

2.   The SRGSTM program at Northern was created in the 1990s[3] and designed for inmates who have been incarcerated and designated by DOC as gang members and threats to the general prison population.

3.   The SRGSTM program differs from the Administrative Segregation program in that it is based on historical perspectives and focuses on inmates who have been designated gang members and are engaging in gang activity.

4.   An inmate is placed in the SRGSTM Program if, among other things, the DOC has evidence that the inmate is involved in committing a crime or carrying out a hit against another gang member.

---

[3] LaJoie believes the program began in 1993.

5.    Since its inception, the SRGSTM program has had three phases, which must be successfully completed by the inmate before he reintegrates into general population.

6.    In general, an inmate remains in Phase I of the SRGSTM program for 120 days.

7.    This period may change depending upon an inmate's behavior or disciplinary history.

8.    Phase I SRGSTM inmates recreate in the prison recreation yard in groups of 8.

9.    Phase I of the SRGSTM is described as a "cooling down" period where the inmate, for a minimum period of four months, is given an opportunity to calm down and get away from the pressure of general population.

10.   Inmates in Phase I of the SRGSTM program may only live or recreate with inmates who are in the same gang or are members of a compatible gang.

11.   Prior to October 2009, inmates in the SRGSTM Phase I program recreated for one hour, five times a week, with other inmates in groups of approximately 6-8 inmates.

12.   Prior to October 2009, SRGSTM Phase I inmates were permitted to recreate without any restraints, i.e., leg irons, tethers or handcuffs.

13.   With very rare exceptions, SRGSTM Phase I inmates are not in leg irons or belly or tether chains during recreation.

4

14.   Inmates who successfully complete SRGSTM Phase I transition into SRGSTM Phase II, which lasts a minimum of ninety days.

15.   Phase II is a period when the inmates continue to settle down and begin to interact with other inmates. As in Phase I, inmates are permitted to recreate in the recreation yard for one hour a day, five times a week.

16.   Phase III, the final phase of the program, is meant to simulate general population.

17.   Inmates in Phase II and Phase III are allowed to recreate without handcuffs.

18.   In all phases of the SRGSTM program, inmates are allowed to exercise in their cells.

19.   On or about October 5, 2009, the recreation policy changed, requiring SRGSTM Phase I inmates to recreate in handcuffs.[4]

   *B. TAYLOR'S BACKGROUND*

20.   Taylor is serving an 80-year sentence for murder and escape in the first degree.

21.   Taylor has been designated by the Department of Corrections as a member and leader of the Latin Kings. Taylor has been incarcerated since 1995, and has been housed at a number of correctional institutes in Connecticut and in New Jersey.

---

[4] At first, the policy change required SRGSTM Phase I inmates to be handcuffed in the front; in January 2010, the policy changed, requiring Phase I SRGSTM inmates to be handcuffed behind the back. [Def.'s Ex. 524a-c].

22.  In May of 2003, plaintiff was transferred under the
Interstate Compact Agreement to New Jersey, where he remained for
roughly three years.

23.  While in New Jersey, plaintiff assumed responsibility for
hiding a loaded, 32 automatic gun in a hallway in the New Jersey
State Prison.

24.  Plaintiff declined to answer questions, on the basis of the
Fifth Amendment, as to how he obtained the gun while in prison
but he did plead guilty to a disciplinary report in New Jersey
for possession of the gun.

25.  On or about September 17, 2008, plaintiff was found to be in
possession of a document discussing the different Latin King
leadership positions and thus received a Security Risk Group
affiliation disciplinary report, to which he pled guilty.

26.  On or about October 1, 2008, plaintiff pled guilty to a
disciplinary report for Security Risk Group Safety Threat Member.

27.  Asserting a Fifth Amendment privilege, plaintiff declined to
answer whether on or about August 22, 2008, he wrote a letter
accusing another inmate of misrepresenting the Almighty Latin
King and Queen Nation.

28.  Plaintiff has at least one tattoo on his body that could be
symbolic of membership in the Latin Kings.

29.  On September 18, 2008, two documents discussing Latin King
activity and its organization were found in plaintiff's property.

Plaintiff received a disciplinary report for Security Risk Group affiliation, to which he pled guilty.

30.  On or about March 18, 2009, plaintiff received a disciplinary report for Contraband A, after several pieces of metal, a screw and a wire were found in his shower shoes.

31.  The items are considered contraband as they can be attached to items such as a toothbrush and made into a homemade knife and/or inserted into an electrical outlet to start a fire. Plaintiff claimed that the items were to be used to construct a device for heating soup, coffee, etc.  Plaintiff pled guilty to the Contraband A disciplinary report.

32.  Plaintiff has said that his cell is his whole world.

33.  Plaintiff seals his door with socks so that he does not hear anyone.

34.  Plaintiff testified that he cannot live with a cellmate and that when that arrangement has been tried, violence between plaintiff and his cellmate has resulted.

35.  In the past, plaintiff has said that he hates all other prisoners, their noises, their smell, their blabbering, their stupidity, and that he hated even being near them.

36. Plaintiff's daily routine is as follows:

> a.  He wakes up and has breakfast around 6:30 or 7:00 AM, and picks up boxes and other items off the floor and puts them on the top bunk.

b.  He then gets down on his hands and knees and with a
    washcloth and shampoo, washes his cell floor and then
    rinses it.
c.  Plaintiff then wipes off the boxes and places them back
    onto the floor.
d.  Plaintiff wipes off the top bunk, books and the desk.
e.  Plaintiff then makes some coffee and listens to the
    news, political shows, music and baseball games on the
    radio.
f.  On days when recreation is after 9:30 AM, he will go to
    recreation.  If it is before that time, he does not go
    to recreation because he has not yet cleaned his cell.
g.  Plaintiff also reads.


C. SRGSTM PHASE I ASSAULTS PRIOR TO OCTOBER 2009

37.  Although SRGSTM Phase I inmates only live or recreate with

inmates who are in the same gang or are members of a compatible

gang, there were numerous fights and/or assaults in 2009, prior

to October 5, 2009.

38.  The Court credits the testimony of Captain Butkiewiez and

District Administrator LaJoie that in 2009 there was an increase

in assaults among inmates and toward staff members, as reflected

in the Incident Summary report for SRGSTM Phase I at Northern.

[Def.'s Ex. 504c]. The increase in assaults among the SRGSTM

Phase I inmates precipitated the change in the restraint policy

at issue.

39.  On January 2, 2009, there was a fight in recreation yard

between two SRGSTM Phase I inmates necessitating the use of a

chemical agent.

40.  On March 9, 2009, there was a fight in the recreation yard involving four SRGSTM Phase I inmates. Officer Chapman injured his right wrist when he inadvertently hit a wall while running to answer the code call.

41.  On April 3, 2009, there was fight in the recreation yard when two SRGSTM Phase I inmates assaulted another SRGSTM Phase I inmate, necessitating the use of a chemical agent.

42.  On May 4, 2009, there was a fight in the recreation yard between two SRGSTM Phase I inmates.

43.  On May 26, 2009, there was a fight in the recreation yard involving nine SRGSTM Phase I inmates, necessitating the use of chemical agent.  Officer Diaz inadvertently got capstun to his eyes.

44.  On June 1, 2009, there was an inmate fight in the recreation yard between two SRGSTM Phase I inmates, necessitating the use of a chemical agent.

45.  On June 4, 2009, there was a fight in the recreation yard among three SRGSTM Phase I inmates.

46.  On July 16, 2009, there was a fight in the recreation yard between two SRGSTM Phase I inmates.  Blood splattered on a correctional officer.

47.  On August 12, 2009, one SRGSTM Phase I inmate attempted to assault another SRGSTM Phase I inmate by rushing toward him and trying to strike him with his fists.

48.  On August 30, 2009, one SRGSTM Phase I inmate began to assault another inmate in the multi-purpose room.

49.  On September 18, 2009, Correctional Officer Harrison was seriously assaulted by two SRGSTM Phase I inmates after he returned one of the unrestrained SRGSTM Phase I inmates to his cell.  This inmate's cellmate threw soup into C/O Harrison's face and then both inmates began punching and kicking him.  C/O Harrison could do nothing but curl up in a fetal position.  Both inmates then resisted responding staff.  [Def.'s Ex. 505, incident report and nice vision footage of incident].

50.  Although the incident involving Officer Harrison, which led to the restraint policy, took place on the tier, not in the recreation yard, the Court credits Captain Butkiewiez's testimony that anytime an inmate is unrestrained, the safety and security of the staff and other inmates is compromised.

51.  The unpredictability, frequency and seriousness of these assaults and fights is a reason, defendants contend, that for the safety and well-being of both staff and inmates, something needed to be done immediately.

52.  Plaintiff was not a participant in any of the fights or assaults that took place in 2009.

*D. PROCESS THROUGH WHICH RECREATION POLICY WAS REVIEWED AND CHANGED*

53.  Following the multiple assaults in 2009, Brian Murphy, interim DOC commissioner, called a meeting to discuss the safety concerns about the SRGSTM program.

54.  Murphy testified that, "the frequency and amount of violence was unacceptable. I thought we had a serious problem and needed to be proactive about it."

55.  Murphy formed a committee, headed by Michael LaJoie, North District Administrator, to review the problems and present recommendations.

56.  LaJoie testified that the recreation restraint policy for SRGSTM Phase I needed to be changed because, "Doing nothing wasn't an option". Murphy agreed that keeping no-restraint recreation was not an option because they needed safety and security.

57.  Regarding the policy change, Murphy testified that he wanted to try to use the least restrictive methods to accomplish the task, but Northern is where the most dangerous inmates are housed. He said he did not want to eliminate the right to recreate altogether in Phase I and wanted to use the least restrictive means to accomplish the goals. Murphy was aware that the Eighth Amendment provides a right to recreate.

58.  Murphy, LaJoie, Quiros and the rest of the committee considered the following options: no recreation; recreation cages; individual recreation; no restraints; some inmates in restraints and some inmates unrestrained; and restraints.

59.  The DOC decided against recreation cages because they lacked the time or money to implement, and recreation cages were part of the Administrative Segregation program, which was meant to be more restrictive than SRGSTM.  Moreover, cages were rejected because the staff wanted to allow the inmates to socialize in order to collect intelligence and to watch inmates interact with each other.

60.  The DOC decided against individual recreation because there would not be enough time in the day to recreate all the inmates.

61.  The DOC decided against eliminating recreation.

62.  The DOC decided against having some inmates restrained and others unrestrained, because individual determinations regarding recreation would undermine the DOC's motto of being "Firm, Fair and Consistent".

63.  On September 25, 2009, Warden Quiros circulated a memo to Deputy Commissioner Mark Strange, with a copy to Michael LaJoie, outlining the proposed corrective changes. Among other changes, it recommended that,

> All inmates classified as SRGSTM, phase 1 inmate shall be handcuffed behind the back for all out of cell activity. The exceptions to this are legal visits, legal phone calls and

social phone calls. For these exceptions, the inmate will be
handcuffed in the front. [Def.'s Ex. 514].

64.   On October 1, 2009, Quiros authored a memo to Deputy

Commissioner Strange, with a copy to LaJoie, setting forth the

adopted policy changes. Quiros stated:

> As requested, the following is an action plan to implement
> the new policy changes for the Security Risk Group Safety
> Threat Member Program at Northern. These policy changes and
> [sic] been reviewed and approved by Assistant Attorney
> General Terry O'Neil.
>
> All Inmates classified as SRGSTM, phase 1 inmate shall be
> handcuffed behind the back for all out of cell activity. The
> exceptions to this are legal visits, legal phone calls,
> inmate court yard recreation and social phone calls. For
> these exceptions, the inmate will be handcuffed in the
> front.

[Def.'s Ex. 515].

65.   Ultimately after considering all the options, including the

fact that Phase I was for a short period of time and the fact

that inmates routinely exercise in their cells, it was decided

that as of October 5, 2009, SRGSTM Phase I inmates would recreate

in handcuffs in the front. [Def.'s Ex. 512]

66.   When the restraint policy for Phase I inmates was changed in

October 2009, the defendants agreed that meaningful exercise was

accomplished by moving the inmate outside of the cell, having the

inmate be with the elements, move their feet, get some sun, walk

around and get some exercise, and enjoy the open space, in

addition to the fact that inmates were allowed to exercise in

their cells.

67.  On January 6, 2010, two SRGSTM Phase I inmates, on their way
to recreation and handcuffed in the front, assaulted Officers
Jones and Guimond. Both officers were struck on their heads with
handcuffs. Numerous staff were injured. [Def.'s Ex. 506a-b,
incident report and nice vision footage of incident].

68.  Effective January 14, 2010, following a memo from Quiros to
LaJoie, SRGSTM Phase I inmates recreated in the yard handcuffed
behind the back. [Def.'s Ex. 524a-c].


 E. SRGSTM PROGRAM AND TAYLOR

69.  Plaintiff went into SRGSTM Phase I from September 18, 2008
to March 5, 2010 (just under 17 months).

70.  For purposes of this case, the relevant time period is
October 2009 through March 2010, the period Taylor, a SRGSTM
Phase I inmate at Northern, was subjected to the recreation
restraint policy.

71.  While in the SRGSTM Phase I program, plaintiff was in a
single cell.

72.  Plaintiff was housed in 214 2 east.

73.  During the entire time that plaintiff was in SRGSTM Phase I,
plaintiff was in a single cell approximately 7 feet wide by 12
feet long, with two narrow bunk beds 30 inches wide by 79 inches
long, a desk 16 inches wide by 36 inches long, a sink/toilet
area, the sink being 28 inches wide by 13 inches deep with the

14

toilet extending out by 24 inches.  Within the cell, defendants allege that plaintiff had sufficient room to perform exercises or calisthenics such as jumping, running in place, push-ups or sit-ups.

74.  During SRGSTM Phase I, Taylor was a barber for other inmates.

75.  From September 18, 2008, through October 5, 2009, as an SRGSTM Phase I inmate Taylor was permitted to recreate one hour a day five times a week, without handcuffs.

76.  From October 5, 2009, after the restraint policy changed, through March 2010, as an SRGSTM Phase I inmate Taylor was permitted to recreate one hour a day five times a week, in handcuffs.

77.  Plaintiff never recreated in belly chains or leg irons while a SRGSTM Phase I inmate.

78.  Prior to implementation of the restraint policy, Taylor and other SRGSTM Phase I inmates could play handball, do push-ups and jog in the recreation yard.

79.  However, plaintiff injured his ankle in 2002 playing handball, at which time he stopped playing handball.

80.  Plaintiff testified that he does a couple of hundred push-ups in his cell per day.

81.  Plaintiff testified that he could do sit-ups and chin ups in his cell, but does not.

82.   In addition to in-cell exercise, during the time that
plaintiff was in SRGSTM Phase I, plaintiff was allowed to walk in
the outside recreation yard, albeit in handcuffs, for 5 hours per
week.


 F. JUSTIFICATION FOR AND EFFECT OF THE SRGSTM PHASE I RECREATION
    RESTRAINT POLICY

83.   It is the professional opinion of defendants that the
decrease in the number of inmate fights in the recreation yards
is directly attributable to the policy requiring that SRGSTM
Phase I inmates recreate in handcuffs.

84.   Any time there is an inmate fight, safety and security of
the correctional facility is adversely affected.

85.   Inmates in the recreation yard who are assaulted or engage
in a fight are at risk of getting injured.

86.   Staff must break up an inmate fight and thus are also at
risk of being injured.

87.   In the past, staff has been injured while responding to
inmate fights.

88.   Riots or disturbances are often started by inmate fights.

89.   Any time there is a major riot or disturbance at a
correctional facility, the safety and security of the general
public is threatened, as hostages can be taken and escapes can
occur.

90.  Plaintiff concedes that the number of fights occurring during recreation in SRGSTM Phase I has decreased since inmates have been restrained during recreation.

*G. OPPORTUNITIES FOR EXERCISE*

91.  Even in restraints, plaintiff and other SRGSTM Phase I inmates could walk in the recreation yard.

92.  Plaintiff's expert in exercise science, Douglas Baumgarten, testified that, even restrained behind the back, an inmate could walk at the pace of 3.5 miles an hour.

93.  Chauncey Sturdivent, a witness for the plaintiff, testified that during SRGSTM Phase I he would run in place, do push-ups, jumping jacks, burpees and crunches in his cell.

94.  Rayquan Stokely, a witness for the plaintiff, testified that SRGSTM inmates would do group exercises in their cells, where one inmate would yell out an exercise and all would do the exercises in unison.

95.  As confirmed by Stokely and Sturdivent, plaintiff's witnesses, other inmates exercise regularly in similar sized cells, doing push-ups and sit-ups.

96.  There is no evidence of any inmate being assaulted or retaliated against during the SRGSTM program for doing in-cell exercise.

97.   Defendants introduced videos of Officer McCormack performing various exercises, such as running in place, squat thrusts and jumping jacks, in different cells.  [Def.'s Exs. 507a-d].

98.  The videos were taken at Northern in a west side cell identical to Taylor's.

99.   In order to film these videos, the entire west unit was evacuated through a fire drill, decreasing the typical level of noise in the unit.

100. The noise produced by exercising is greatest for the cell beneath the cell where the exercises are being done. [Def.'s Ex. 507b].

101. The Court credits the testimony of Dr. Ducate, an expert in correctional medicine, that plaintiff can do calisthenics in his cell, such as lunges, jumping jacks, sit-ups, crunches, push-ups, squats, and running in place, which, when alternated rapidly, can provide significant cardiovascular benefits.

102. The Court credits the testimony of Dr. Ducate that navy submarine officers who are confined to small spaces, akin to a prison cell, are able to stay in shape by performing a series of calisthenics, as reflected in Def.'s Ex. 520, a Submarine Series-Level 1 and 2, Navy Operational Fitness Series.

103. The Court credits the testimony of Dr. Ducate that, to a reasonable degree of medical certainty, plaintiff had a meaningful opportunity to exercise.

104. The Court credits the testimony of Dr. Ducate that there is no evidence to indicate that plaintiff had any mental health problems because of a lack of exercise.

105. The Court credits the testimony of Dr. Ducate that there is no evidence that recreating in handcuffs caused plaintiff to suffer any physical or mental health injuries.


II.   DISCUSSION

Plaintiff alleges that defendants violated his constitutional rights under the Eighth Amendment to the United States Constitution by depriving him of the opportunity for meaningful recreation. The question before this Court is whether plaintiff has sustained his burden of proof on this claim. For the reasons that follow, the Court concludes that plaintiff has failed to sustain his burden of proof and finds in favor of the defendants.

*Eighth Amendment*

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993); see also Rhodes v. Chapman, 452 U.S. 337, 351 (1981). To prevail on an Eighth Amendment claim, an inmate must provide evidence demonstrating the failure of prison

officials to provide for inmates' "basic human needs-e.g., food, clothing, shelter, medical care, and reasonable safety." <u>DeShaney v. Winnebago County Dept. of Social Servs.</u>, 489 U.S. 189, 200 (1989).  An inmate may prevail on an Eighth Amendment claim only where he proves both an objective element and a subjective element. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994); <u>Jolly v. Coughlin</u>, 76 F.3d 468, 480 (2d Cir. 1996).

To satisfy the objective element, a "plaintiff must demonstrate that the conditions of his confinement result 'in unquestioned and serious deprivations of basic human needs.'" i.e. violating contemporary standards of decency. <u>Jolly</u>, 76 F.3d at 480 (quoting <u>Anderson v. Coughlin</u>, 757 F.2d 33, 35 (2d Cir. 1985)). "A court faced with the task of determining whether a particular deprivation falls below the objective requirements of the Eighth Amendment should consider (1) the duration of the deprivation; (2) the extent of the deprivation; (3) the availability of other out-of-cell activities; (4) the opportunity for in-cell exercise; and (5) the justification for the deprivation." <u>Williams v. Goord</u>, 142 F. Supp. 2d 416, 425 (S.D.N.Y. 2001) (citations omitted).

The subjective element requires a plaintiff to show that the prison official acted with a "sufficiently culpable state of mind", i.e., with "deliberate indifference to inmate health or safety." <u>Farmer</u>, 511 U.S. at 834 (citations omitted).

20

*Denial of Recreation*

Both the Supreme Court and the Court of Appeals for the Second Circuit have acknowledged that exercise is a basic human need that must be provided for inmates.  See Wilson v. Seiter, 501 U.S. 294, 304-05 (1991); Williams v. Greifinger, 97 F.3d 699, 704 (2d Cir. 1996); Sostre v. McGinnis, 442 F.2d 178, 193 & n.25 (2d Cir. 1971).  Restrictions on exercise should not be "routine."  Restrictions must be limited to unusual circumstances or situations where restrictions are needed for disciplinary reasons.  See Hope v. Pelzer, 536 U.S. 730, 737 (2002) (noting that penological concerns may be considered in reviewing an Eighth Amendment claim); Bell v. Wolfish, 441 U.S. 520, 547 (1979) ("the problems that arise in the day-to day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that, in their judgment, are needed to preserve internal order and discipline and to maintain institutional security").

While courts have found that denial of all opportunity to exercise violates an inmate's constitutional rights, they have found no violation where the inmate has some opportunity for exercise, either in or outside of his cell. Indeed, the issue has been litigated in this Court for decades. Recently, Judge Droney in Shakur v. Sieminski, Civ. No. 3:07cv1239 (CRD), 2009 WL

2151174 (D. Conn. July 15, 2009), in granting defendant summary judgment, held that plaintiff's right to recreate was not violated where, "there is sufficient room for Shakur to perform calisthenics, run in place or do sit-ups or push-ups. . . in his cell". Similarly, in Morgan v. Rowland, Civ. No. 3:01cv1107 (CRD), 2006 WL 695813, at *7 (D. Conn. March 17, 2006), the Court found that plaintiff, a Phase I Administrative Segregation inmate at Northern who was in full restraints during his outdoor recreation, did not suffer a constitutional violation given that he had sufficient room in cell to perform calisthenics. In Dawes v. Coughlin, 964 F. Supp. 652 (N.D.N.Y. 1997), aff'd, 159 F.3d 1346 (2d Cir. 1998), the Court held that requiring an inmate to recreate in full restraints pursuant to a restraint order issued for safety and security reasons did not violate inmate's Eighth Amendment rights where inmate was able to move around in recreation area.

With these principles in mind, the Court turns to the record before it.

### 1. OBJECTIVE ELEMENT

With regard to the objective element, the Court considers factors including the duration and extent of the deprivation, the availability of other out-of-cell activities, the opportunity for in-cell exercise and the reason for the deprivation. Williams v. Goord, 142 F. Supp. 2d, at 425.

(1)    *Duration of the deprivation*

        The evidence shows that SRGSTM Phase I was meant to be of
limited duration and a cooling down period, lasting 120 to 180
days. The evidence established that transition to Phase II of the
program, where recreation was less restricted, was voluntary and
depended on the inmate's willingness to subscribe to the
program's philosophy. Mr. Quiros testified that, "[l]ack of
motivation in the program poor attitude in the program,
intelligence that we have gathered of still engaging in gang
activity could prevent or prolong the stay." [Quiros depo. at
53].

        With regard to Mr. Taylor specifically, the duration of his
stay at Phase I was about 17 months, considerably more than the
typical four months. Mr. Quiros testified that Mr. Taylor spent
more time in Phase I because he was a second time designation,
meaning that this was his second time going through the program.
Mr. Quiros explained that when "you're a second designation, you
gotta remain free, disciplinary free, for two years before you
are even considered to be removed from that status [. . .]".
[Quiros depo. at 54]. Although Mr. Taylor was in Phase I for 17
months, the restraint policy at issue was only in effect for the
final 6 months of Mr. Taylor's time in Phase I.

(2)    *The extent of the deprivation*

The record is uncontroverted that the change in the recreation restraint policy limited plaintiff's ability to do certain exercises and engage in certain activities while recreating in the yard. Without handcuffs, plaintiff and other inmates could use the outdoor recreation yard to play handball, jog or run vigorously, do push-ups and other calisthenics.[5] With handcuffs, the plaintiff and other inmates were limited to walking around and talking with other inmates. The Court credits the testimony of plaintiff's expert in exercise science that even with handcuffs behind the back, a person could safely walk at a speed of 3.5 miles an hour. Moreover, the Court credits the defendants' testimony that the recreation restraint policy did not interfere with plaintiff's opportunity to breathe fresh air, be exposed to direct sunlight, socialize with other inmates, walk around, and have a change of activity in a day that was spent mostly in his cell.

Further, the Court credits the testimony of Dr. Ducate, an expert on correctional medicine familiar with the plaintiff's health, that (1) there is no evidence that plaintiff suffered any mental health problems because of a lack of exercise, and (2) there is no evidence that recreating in handcuffs caused plaintiff to suffer any physical or mental health injuries.

---

[5] Since 2002, Mr. Taylor was unable to play handball because of his ankle injury.

The Court finds that the extent of the deprivation, in light of the purpose and limited duration of SRGSTM Phase I and the security concerns of the facility, was not objectively unreasonable.

(3)   *The availability of other out of cell activities*

There is no dispute that SRGSTM Phase I was very restrictive, with limited activities or programming. Generally, an SRGSTM Phase I inmate was allowed one hour of recreation daily, Monday through Friday; three 15-minute showers a week, three 15-minute telephone calls and, if necessary, medical, social and legal visits. LaJoie testified that all meals were in the cell and there was no educational programming during Phase I. Additionally, during Phase I, Mr. Taylor was permitted to barber for other affiliate SRGSTM members.

The program was designed to make opportunities for out of cell activities during SRGSTM Phase I extremely limited. However, the Court finds that recreation for one hour, five times a week, outdoors, even in handcuffs, provided plaintiff and other inmates many benefits, including the opportunity to breathe fresh air and have exposure to direct sunlight, to talk and socialize with other inmates, to walk around, to stretch their legs, and to enjoy the more open space.

(4)  *The opportunity for in-cell exercise*

The Court finds that plaintiff had the opportunity to meaningfully exercise in his cell. In arriving at this conclusion, the Court relies on evidence that inmates were permitted to exercise in their cells, plaintiff's testimony that he performed exercises in his cell, the testimony of inmates Sturdivent and Stokely regarding their in-cell exercise routine, the videos [ex. 507a-d] that show Officer McCormack performing push-ups, sit-ups, jumping jacks, squat thrusters and running in place, and Dr. Ducate's expert testimony that plaintiff could meaningfully exercise in his cell.

Mr. Taylor testified that the choice to exercise is a personal one, and that he is generally in decent shape. He further testified that in his cell he does push-ups, sometimes a couple of hundred push-ups, and has the ability to do sit-ups, when he is "not lazy". He further conceded that in his cell he would be able to do dips and leg lifts.

Stokely and Sturdivent both testified that during SRGSTM Phase I and in other programs, they and other inmates exercised in their cells. Stokely testified that while in Administrative Segregation unit, whose cells are similar to the SRGSTSM cells, he would do push-ups, pull-ups, sit-ups, burpees, about three times a week for an average of 90 minutes with his roommate, Edward Lamont.  The Court credits Mr. Stokely's testimony that

sometimes SRGSTM inmates would do group exercises, yelling out the exercise to be done and performing them in unison. This was confirmed by Warden Quiros.

The videos made and introduced by defendants reveal that (1) Officer McCormack had sufficient space in the cell to undertake these rigorous exercises; (2) the noise made from the exercises was not significant, and (3) Officer McCormack worked up a sweat during the short time he undertook the exercises.

The Court assigns considerable weight to the testimony of Dr. Ducate, an expert in correctional medicine, who knows the plaintiff and is very familiar with his conditions of confinement. As stated above, Dr. Ducate testified that plaintiff can do calisthenics in his cell which, if alternated rapidly, can provide significant cardiovascular benefits. She also gave compelling examples of submarine officers in the Navy who, confined to small spaces, are able to maintain an adequate level of fitness by performing a series of calisthenics, as reflected in Def.'s Ex. 520, a Submarine Series- Level 1 and 2, Navy Operational Fitness Series.

Finally, the Court rejects the assertion that plaintiff was deterred from doing exercise in his cell, due to fear of retaliation from other inmates because of noise or other nuisance caused by the exercise. There is no evidence that Mr. Taylor was prohibited or deterred from exercising in his cell. Mr. Stokely

testified that in 2007, when he was in the Security Risk Group, a fight broke out in the recreation yard because of exercise done in the recreation yard, but that this did not cause him to change his in-cell exercising routine.

(5)  *The justification for the deprivation*

The Court finds that the record overwhelmingly supports as valid the proffered justification for the change in the SRGSTM Phase I recreation restraint policy. The evidence shows that the policy was put into place to enhance safety and security at Northern for the inmates and the prison staff following a number of emergencies in 2009. As previously described, as early as January 2009, a fight broke out in recreation yard between two SRGSTM phase I inmates. This incident was followed by a series of fights in the recreation yard involving SRGSTM Phase I inmates on March 9, April 3, May 4, May 26, June 4, and July 16, 2009, and assaults on staff, including the September 18, 2009 incident when Correctional Officer Harrison was seriously assaulted by two SRGSTM Phase I inmates after he returned one of the unrestrained SRGSTM Phase I inmates to his cell.  The Court credits the testimony of defendants Quiros, LaJoie and Murphy that the safety and security of inmates and staff was a paramount concern, prompting the review and ultimate changes to the recreation restraint policy. The Court also credits the defendants'

testimony that other less restrictive options were considered, but ultimately rejected because they were impractical, too costly or unsafe. The Court finds that the increase in violent incidents involving SRGSTM Phase I inmates in 2009 was adequate justification for the change in the recreation restraint policy.

Weighing the five factors, the Court concludes that plaintiff has failed to meet his burden of demonstrating that the policy of recreating SRGSTM Phase I inmates in the recreation yard in handcuffs violated contemporary standards of decency or the Eighth Amendment.

### 2. SUBJECTIVE ELEMENT

The subjective element of an Eighth Amendment claim requires plaintiff to show that the defendants acted with a "sufficiently culpable state of mind", i.e., with "deliberate indifference to inmate health or safety." Farmer, 511 U.S. at 834, 114 S.Ct. 1970 (quoting Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Salahuddin v. Goord, 467 F.3d 263 (2d Cir. 2006). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." Salahuddin, 467 F.3d at 280 (citing Farmer, 511 U.S. at 839-40, 114 S.Ct. 1970). Here, plaintiff has failed to meet his burden.

The Court finds that defendants sincerely believed that changing the restraint policy was necessary to protect inmate and

staff safety. See Salahuddin, 467 F.3d at 280 ("The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere."). Plaintiff introduced no evidence from which the Court could conclude that defendants believed the change in policy would result in a substantial risk of harm to plaintiff or other inmates. Indeed, the opposite is true; the evidence shows that defendants believed that, given the rise in violence, the no restraint recreation policy posed more of a risk of serious harm to inmates than the more restrictive restraint policy. See Johnson v. Ruiz, Civ. No. 11cv542 (JCH), 2012 WL 90159 (D. Conn. Jan. 10, 2012) ("Under Farmer v. Brennan, 511 U.S. 825 (1994), prison officials have a duty to make reasonable efforts to ensure inmate safety. This duty includes protecting inmates from harm at the hands of other inmates"). This conclusion is buttressed by the fact that the policy was originally changed to allow recreating inmates to be handcuffed in front, and made more restrictive after inmates used the handcuffs to assault staff. As such, plaintiff failed to satisfy the subjective element.

*Qualified Immunity*

Even if plaintiff had adduced enough evidence to meet his burden of proving an Eighth Amendment violation, the defendants would be entitled to qualified immunity on this claim. The doctrine of qualified immunity protects government official from civil suits arising from the performance of their discretionary functions when (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Lennon v. Miller, 66 F.3d 416, 420-21 (2d Cir. 1995).

There is no evidence from which the Court could conclude that the defendants knew that the change in policy would violate plaintiff's rights. On the contrary, the evidence shows that in response to a security and safety emergency, defendants considered several options and decided on the policy in question because it allowed inmates to recreate while at the same time achieving the necessary security and safety. Most importantly, the evidence established that defendants consulted with the Attorney General's office prior to implementing the restraint policy and received approval from Assistant Attorney General Terry O'Neil. See Def's Ex. 515, Memo from Warden Quiros to Deputy Commissioner Strange, dated October 1, 2009, stating in part, "These policy changes and [have] been reviewed and approved

by Assistant Attorney General Terry O'Neil." Having consulted with and relied on an opinion from the Attorney General's office, it was objectively reasonable for the defendants to believe that their actions did not violate plaintiff's rights. See Oliveira v. Mayer, 23 F.3d 642, 648-49 (2d Cir. 1994). Therefore, qualified immunity serves as an additional basis for the entry of judgment in favor of the defendants.

III. CONCLUSION

The Court finds that plaintiff failed to prove that defendants subjected him to conditions of confinement constituting cruel and unusual punishment in violation of the Eighth Amendment by adopting and implementing a policy requiring SRGSTM Phase I inmates to recreate in handcuffs.

Accordingly, judgment is entered in favor of defendants on all counts.

This is not a recommended ruling.  The parties consented to proceed before a United States Magistrate Judge [doc. #26] on January 21, 2011, with appeal to the Court of Appeals.

ENTERED at Bridgeport this 29th th day of September 2012.

                              /s/
                              _____
                              HOLLY B. FITZSIMMONS
                              UNITED STATES MAGISTRATE JUDGE